Downtown Barre Development v. C&S Wholesale Grocers, Inc., No. 669-10-02 Wncv
(Teachout, J., Mar. 18, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the
original. The accuracy of the text and the accompanying data included in the Vermont trial court
opinion database is not guaranteed.]


**STATE OF VERMONT**
**WASHINGTON COUNTY, SS.**


| | | |
|---|---|---|
| **DOWNTOWN BARRE DEVELOPMENT** | ) | |
| **A Limited Partnership** | ) | |
| | ) | |
| **v.** | ) | **WASHINGTON SUPERIOR COURT** |
| | ) | **Docket No. 669-10-02 Wncv** |
| **C & S WHOLESALE GROCERS, INC.,** | ) | |
| **GU MARKETS, LLC.,** | ) | |
| **GU MARKETS OF BARRE, LLC** | ) | |
| | ) | |
| **MAXI DRUG, INC., Intervenor** | ) | |


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**Final Hearing on the Merits**

Plaintiff, the owner of a shopping plaza in Barre, seeks to enjoin Defendants (one of
which is a tenant) and the Intervenor (its sublessee) from pursuing a plan to change the former
Grand Union store in the plaza from a single large supermarket to two smaller retail stores.
Plaintiff also seeks eviction and compensatory and punitive damages. Defendants are related
corporate entities, one of which acquired the lease to the store from the bankruptcy court
following Grand Union's bankruptcy and subsequently assigned it to Intervenor. Defendants
seek to have the complaints against them dismissed on the grounds that the lease has been
assigned to Intervenor, and that the Intervenor's conduct is permissible under the lease. The
Intervenor claims its proposed alterations to the store space are permissible under the lease, and
it seeks to have the Preliminary Injunction issued on December 16, 2002 vacated and all claims
against it dismissed.

The final hearing on the merits took place on February 4 and 5, 2003. Plaintiff is
represented by Andrea Gallitano, Esq. Defendants are represented by Leighton C. Detora, Esq.,
and the Intervenor is represented by Robert DiPalma, Esq.

Downtown Barre Development, the Plaintiff (hereinafter DBD), is a limited partnership that was formed in 1973 for the purpose of developing and owning the shopping center property at the center of this dispute. The property consists of 3.25 acres located at 321-355 North Main Street in Barre. DBD bought land, tore down old buildings, and negotiated with Grand Union Stores of Vermont, which operated a Grand Union store across the street at the time, to build a shopping plaza consisting of two parts: a new 26,000 square foot supermarket to be leased and operated by the Grand Union, and an attached group of retail store spaces with an aggregate of 16,000 square feet. DBD lined up leases prior to construction. The first lease, and the one that is the subject of this lawsuit, was with Grand Union. It was signed on February 15, 1973, prior to the construction of the project. It specifically incorporates within its terms construction plans labeled the "Grand Union Project," and "Grand Union and Minor Stores." Leases were also lined up with the "minor store" tenants.

The Grand Union lease was written for 20 years with four five-year renewal options permitting the tenant to rent for up to a total of 40 years. It provided for a fixed base rent, amounting to approximately $3.30 per square foot, plus a percentage rent based on gross sales over $8.6 million and capped at $10 million per year. The lease identifies the tenant's use as a supermarket, and specifically refers to the sale of groceries, meats, fish, delicatessen products, fruits, vegetables, etc., although it also permits "any lawful use." The tenant, Grand Union Stores of Vermont, only operated grocery stores. Under the lease, Grand Union Stores of Vermont had "top billing" on any tower erected to advertize the stores in the plaza.[1] DBD was required to limit the use of minor store spaces to retail shops only,[2] and to include restricted use limitations in the leases of the minor stores precluding the sale of food for consumption off premises.[3] It was required to preclude the sale of beer by the minor tenants.[4]

DBD was required to construct the building according to specified plans for supermarket use. The lease was signed before the building was constructed, and DBD was to deliver the premises for possession by December 15, 1973. If it could not deliver possession by February 1, 1974, Grand Union could terminate the lease. In that event, DBD was not permitted to use any portion of the shopping center "as a food supermarket" for three years.[5] This is a clear indication of the purpose of the leased space.

---

[1]See Lease, paragraph 37.

[2]See Lease, paragraph 27.

[3]See Lease, paragraph 10.

[4]See Lease, paragraph 39, and Modification Agreement dated December 29, 1982, paragraph 1.

[5]See Lease, paragraph 2.

DBD retained responsibility for all structural repairs and improvements, and was required to maintain insurance. Grand Union had considerable flexibility with respect to fit-up and decoration of the premises to suit its needs, and had a specifically defined right to expand the size of the store. All modifications to the lease were required to be in writing. One provision specifically provided that Grand Union had no express obligation to operate.

Leases for minor tenants provided for fixed rentals with CPI increases, and much shorter terms. Each lease contained a restriction limiting property use to a specific retail purpose. Rent started at approximately $4.50 per square foot in 1973, and has ridden up with the market so that in 2003 rentals are at approximately $10 per square foot and higher for some spaces. Minor tenants over the years have included a pharmacy, restaurant, barber and beauty shop, travel agency, sewing shop, flower shop, drycleaner, video store, optician, state employment office, furniture rental, and dental office.

From the beginning, both DBD and Grand Union maintained a high degree of fidelity to the written lease terms, and even minor changes were incorporated in written modifications. The First Modification, dated December 17, 1973, contained very specific details modifying the original preconstruction terms, and other provisions related to design for future expansion, and insolvency of the tenant.

The relationship between Grand Union and the minor tenants was symbiotic: Grand Union attracted a large amount of foot traffic and although it paid a relatively low rent per square foot, it had a long term stable presence that attracted the public to the center. The minor storeowners benefitted from proximity to the Grand Union and the free parking it offered. In 1975 Richard Gariboldi moved his barbershop to the plaza from another location in Barre for these reasons, and has been there since. He estimates that 80% of his clients are walk-ins, often including people who visit the plaza to go to the supermarket. The presence of the minor stores also benefitted Grand Union, which jealously guarded its exclusive right within the plaza to sell grocery items. Grand Union and the minor retailers were thus not in competition with each other, but rather complemented each other's business purposes in a mutually beneficial manner. The plaza was structured to operate this way from the very beginning, even before it was built, and has maintained this character throughout the past 29 years. While DBD has realized no increased rental under the Grand Union lease over the last 29 years, it has profited from the increased rental values paid by the minor tenants.

This is a typical "community" style of shopping center, with a supermarket or discount store functioning as an anchor store, providing a major draw for shoppers, with minor retail shops nearby. Anchor stores in community shopping centers are typically grocery stores or department or discount stores, which offer a wide variety of products to attract large numbers of shoppers. Anchor stores generally occupy over 20,000 square feet of space. The community shopping center model is one of three types of shopping centers. A second type is a large regional mall, which typically has a number of stores serving a large region. The third type is a neighborhood strip mall, which does not have a major store but rents spaces to businesses which

3

attract customers independent of foot traffic, such as for tax preparation.

The Second Modification on November 24, 1975 demonstrates the parties' close adherence to lease terms and to the "community" style of shopping center. Although Grand Union knew that DBD intended, before construction, to rent one of the minor spaces to the State for an employment office and apparently had informally approved such a rental, it nonetheless objected that this was out of compliance with the lease because the use would not be for a retail store. It finally consented and signed a written modification which permitted the noncomplying use for a limited time only.

The Third Modification on July 14, 1976 shows the extent to which physical alterations called for modification in writing. Under this modification, Grand Union was permitted to relocate the store entrance, and the costs were specifically allocated. DBD assumed these costs, consistent with its obligation to maintain responsibility for structural improvements.

Under the Fourth Modification dated December 29, 1982, Grand Union agreed to allow the restaurant in one of the minor spaces to sell beer and wine for consumption on the premises only. This was an exception to its exclusive right to sell beer in the plaza. In exchange, it received two additional five-year renewals, permitting it to extend the lease up to 50 years, with a 10% increase in rent during the last two renewals.

In 1985, Grand Union wanted to incorporate a pharmacy in its supermarket, and had plans to do so, but after DBD opposed this because it would compete with the pharmacy which occupied one of the minor store spaces, Grand Union backed off and did not pursue its plan.

Under the Fifth Modification, dated March 26, 1985, Grand Union was permitted to add a bubble entrance to the front of the store at its own expense. This modification further incorporated provisions for DBD to buy adjacent land and provide additional parking, with Grand Union paying additional rent spread over a period of years.

While figures are not available for all years, gross sales in many years, at least until the mid-90's, exceeded $8.6 million, and were as high as $15 million. The maximum percentage rent of $14,000, based on $10 million in gross sales, was reached in many years, although actual payment was also reduced by some agreed-upon charges.

In the mid-90's, Grand Union sought Chapter 11 bankruptcy protection, and it reorganized and later recovered. During this period, a representative of Maxi Drug, Inc., which operates Brooks Pharmacies, contacted DBD with some interest in purchasing the plaza. Maxi Drug already operated a Brooks Pharmacy in Barre, and was looking to expand. Nothing came of the contact at that time, although DBD has always been open to selling the plaza, and has had it listed for sale under an exclusive contract with a realtor since shortly after the plaza opened.

Maxi Drug owns 330 Brooks Pharmacies in New England. Of those, 79 are located in owned premises and the remainder are leased. It is a wholly owned subsidiary of a Canadian company which has 262 pharmacies. Its prototype store consists of 11,200 square feet, less than

4

half the size of the former Grand Union space. It has a few stores with as much as 25,000 square feet, but those constitute fewer than 10 out of its total of 330 stores. It runs a pharmacy in the back of its stores, and sells other items in the front part of the store: film, film processing, cosmetics, snacks, seasonal items, cards, appliances, tobacco, gifts, and other items. Sixty-seven percent of its sales are from the pharmacy, and thirty-three percent are from the sale of front store items.

In 2000, Grand Union went into liquidation bankruptcy. DBD received notice of the proceedings in bankruptcy court in New Jersey, and chose not to participate. In the bankruptcy, C & S Wholesalers, Inc., located in Brattleboro, Vermont (hereinafter C & S), purchased many of the assets previously held by Grand Union, and created a Vermont LLC called Grand Union Markets LLC (hereinafter GU) to hold them. It then organized a separate LLC for each of the individual former Grand Union properties. The one for the Barre store was called Grand Union Markets of Barre LLC (hereinafter GUMB). On December 8, 2000, the bankruptcy court issued an Order approving the transfer of Grand Union's lease to GUMB. Throughout this period, the Grand Union supermarket remained open and operating in the Grand Union Plaza in Barre.

In the summer of 2001, Howard Nobleman of Maxi Drug contacted DBD about available space in the plaza. Rick Davis, Co-Trustee of the Richard E. Davis Trust that is a general partner of DBD, gave him information regarding leases. They discussed the possibility of Maxi Drug purchasing the plaza, and Rick Davis told him it was for sale for $2 million. In the fall, Mr. Nobleman wrote to Mr. Davis offering to buy the plaza for $2 million on terms that included several contingencies. DBD declined the offer.

Mr. Nobleman later contacted DBD again about buying the Brown's Pharmacy lease and replacing Brown's Pharmacy in one of the minor stores. Consent of DBD was required for assignment of the lease to Maxi Drug. Mr. Nobleman proposed obtaining more space in the plaza in addition to the space Brown's occupied. This would have required reconfiguring the space in the minor store portion of the plaza, and DBD declined to do so in order to avoid disturbing the successful businesses of the minor tenants. Several other long-time businesses in Barre had undergone minor changes which caused them to go out of business, and DBD did not want this to happen to its minor store tenants at the plaza. DBD did consent to the sale of the Brown's lease to Maxi Drug, which then opened its second Barre store in the former Brown's Pharmacy space.

In December of 2001, DBD contacted C & S to initiate discussions about renegotiating the lease in the aftermath of the Grand Union bankruptcy. DBD did not know about the transfer of the lease to GUMB, as it had not followed the bankruptcy proceeding. In response, Carl Wistreich of C & S faxed to DBD a copy of the bankruptcy Order approving the transfer of the lease to GUMB. DBD notified Mr. Wistreich that it took the position that the lease could not be assigned, and objected to any assignment of the lease. At that time, the supermarket continued to operate.

In March of 2002, Maxi Drug contacted C & S about obtaining the lease to the

5

supermarket space, but C & S was not willing to sell it. Maxi Drug tried again one month later, and began negotiations with C & S.  Although the lease was held by GUMB, all officers of GUMB, as well as GU, are employees of C & S, and the addresses of all three entities are the same.  In testimony as well as in correspondence in evidence, both Howard Nobleman and Rick Davis repeatedly referred to C & S as the entity making the decisions.   While both GUMB and GU were registered with the Secretary of State's office, they failed to file annual reports for 2001 and 2002 and were not in good standing at the start of the final hearing in this case.  GUMB has subsequently filed its report.

Also in the spring, Maxi Drug again offered DBD $2 million to buy the plaza.  The principals of DBD met, considered the offer, and decided to reject it.  They decided instead to invest in improving the plaza, which they did.  They got bids for paving and lighting, and bought an adjacent small plaza that became available, thereby enlarging the property.  Rick Davis wrote to C & S and took the position that the terms of the lease did not permit it to be assigned.  He said that if C & S did so, DBD would treat it as attempting to reduce its obligations under the lease, which would permit DBD to terminate the lease on the renewal date of February 13, 2003.

In the summer of 2002, Howard Nobleman of Maxi Drug contacted DBD about taking over the Grand Union store space.  Although the Grand Union supermarket was still open, DBD was aware that it was not doing well. Maxi Drug wanted to divide the space into two separate spaces, and operate a Brooks Pharmacy in only one half.  DBD expressed some interest in that proposal but only with a substantial increase in rent.  Written proposals began to be exchanged between attorneys for terms of a replacement lease.  Ultimately, DBD rejected Maxi Drug's proposals.

In the meantime, Maxi Drug's separate negotiations with C & S had come to fruition, and on August 16, 2002, GUMB and Maxi Drug entered into a letter of agreement for the assignment of the Grand Union lease to Maxi Drug at a price of $475,000, of which $47,500 was paid as a deposit.  Closing was scheduled for October 20, 2002. Maxi Drug sent the deposit funds, as instructed, to an account of GU.  One provision of this agreement was that if Maxi Drug breached any terms of the lease, it agreed to provide indemnification to GUMB.  Another provision is that GUMB could cancel the agreement if it could not get a store in Berlin by the closing date, October 20, 2002.  Thus, it appears that the plan of C & S was to operate a store in nearby Berlin and abandon the Barre store; if it could succeed in making progress opening a Berlin store, GUMB would follow through with the letter of agreement and  close the Barre store and sell the lease to Maxi Drug.

After obtaining this agreement for assignment, Maxi Drug, through Howard Nobleman, resumed discussions with DBD about the terms of a replacement lease.  Mr. Davis specifically asked Mr. Nobleman if Maxi Drug had obtained an assignment of the lease.  Mr. Nobleman, who knew that there was a signed letter of agreement and a deposit paid, said there was nothing concrete.  Mr. Davis told him that DBD's position was that the lease could not be assigned. Maxi Drug again proposed to divide the store in two, with DBD paying the costs of demising the store and retaining the second half, which Maxi Drug did not want, to rent on its own.  By this time

6

Maxi Drug already had developed a layout plan for dividing the store space, without telling DBD.  Maxi Drug's attorney sent another proposal.

When DBD rejected the proposal as not in its interest, Howard Nobleman traveled to Barre for a face-to-face meeting with DBD's principals.  He described Maxi Drug's plan to split the store at DBD's cost, with no change in rent and DBD taking back the other half.  He asked for a response in one week.  He stated that Maxi Drug had already made a "substantial investment" in the property.  When he was asked if the lease had been assigned to Maxi Drug, he said no.

One week later, on September 27, 2002, Rick Davis told Howard Nobleman by telephone that DBD rejected the offer as not being good for DBD in the long run.  Howard Nobleman then said, "We're just going to go in and take it over."  Mr. Davis said, "We will be watching you very carefully."

Mr. Davis then wrote to Carl Wistreich of C & S objecting to Maxi Drug's plan to split the store as violating paragraph 16 of the lease on the grounds that the proposed renovations were not for the purpose of Grand Union or C & S's business, and would decrease the cubical contents of the building and adversely affect the value of the buildings.[6]

On October 18, 2002, the supermarket stopped operating.  A contractor working on behalf of C & S or GUMB immediately came in to the store and removed all shelving and fixtures.

Mr. Wistreich telephoned Mr. Davis and said that an assignment to Maxi Drug was imminent, and that Mr. Davis should start dealing with Maxi Drug.  Mr. Davis said that if C & S/ GUMB  backed away from its obligations under the lease, DBD would terminate the lease under paragraph 4.[7]  Mr. Wistreich then stated that "we" would remain secondarily liable.  Following

---

[6]Paragraph 16 reads as follows: "The Tenant may from time to time at its expense paint and decorate the premises and make such changes, alterations, additions and improvements as will, in the judgment of the Tenant, better adapt the same for the purpose of its business.  The alterations and additions shall be of such a character as not to adversely affect the value or decrease the cubical contents of the building."

[7]Paragraph 4 reads as follows: "The Tenant may assign this lease or sublet the demised premises, or any part thereof, for the purpose herein permitted, or for any other lawful use which will not be extra hazardous on account of fire without relieving the Tenant, however, from its obligations hereunder.  In the event the above named Tenant assigns this lease or sublets the demised premises, or any part thereof, during the initial term of this lease, the Tenant herein may, by notice to the Landlord, terminate any and all obligation or liability of the Tenant herein hereunder accruing after the expiration of the initial term of this lease, and in the event of an assignment or subletting during a renewal term, the Tenant herein may, by notice to the

7

the conversation, Mr. Davis wrote a letter memorializing Mr. Wistreich's statement that "we" [GUMB] would remain only secondarily liable. Mr. Davis treated that as an attempt to reduce GUMB's obligations, and stated that if C & S (as opposed to Maxi Drug), did not pay rent, DBD would terminate the lease. Mr. Wistreich wrote back with his own version of the conversation, and confirmed that GUMB remained obligated under the lease.

On October 25, 2002, DBD filed a complaint for declaratory judgment against C & S, GU, and GUMB, on which it asked the court to declare the parties' respective rights and obligations under the lease. DBD did not know whether an assignment had taken place and whether GUMB was seeking to reduce its obligations. Its principals understood that there was a plan to split the store, and DBD opposed this plan as unauthorized under the lease terms. DBD also continued to take the position that the lease could not be assigned. The same day, Carl Wistreich faxed a letter to DBD confirming that GUMB would remain liable. He also was highly critical of DBD's objection to an assignment and of DBD's position that it would not accept rental payments from Brooks. "Similarly, your earlier threat of eviction was not well taken. It is becoming increasingly apparent to us that you are concocting nonsensical arguments, in vain, because you recognize that the facts, terms of the Lease, and law do not support you. If you continue to engage in such infantile behavior, we will be forced to take appropriate legal action. We are confident that any court in this country will validate the assignment, and probably sanction your unprofessional conduct." The letter makes no mention of DBD's objection to the splitting of the store. As of this date, C & S had provided no information to DBD about the facts of any assignment, nor had it provided DBD with any information about Maxi Drug's proposal for use of the space or plans to do renovation work to the building, including alterations to structural systems.

On October 29, 2002, the closing was held on the assignment of the lease from GUMB to Maxi Drug. The funds were wired per instructions to an account of GU. The same day, a local building permit was obtained by Connor Construction on behalf of Maxi Drug in the name of DBD to do renovation work on the property, with no knowledge or involvement of DBD. When DBD learned of the permit and proposed renovation work, it filed for a temporary restraining order, which was denied on an ex parte basis on the grounds that there was no indication that physical work would be started on the property before notice and a hearing could take place.

On October 31, 2002, Carl Wistreich wrote to Mr. Davis stating that the assignment had taken place, and directing DBD to direct all communications and correspondence to Maxi Drug. He repeated that GUMB would retain its obligations under the lease. Since November 1, 2002, rent has been paid by Maxi Drug.

On November 5, 2002, Maxi Drug directed Connor Construction to start work under a

---

Landlord, terminate any and all obligation and/or liability of the Tenant named herein accruing after the expiration of such renewal term. ¶ It is agreed, however, that the Landlord shall have the right to cancel and terminate this lease without further liability of either party to the other at such time as the Tenant's liability hereunder shall cease pursuant to the foregoing."

$565,000 contract to renovate the former supermarket space, and work began the following day. When Connor arrived, the former supermarket was "broom clean" with all fixtures and shelving removed. Its ceilings, walls, doors, flooring, and plumbing and electrical fixtures were in place. Pursuant to its contract with Maxi Drug, Connor began to remove all but the building envelope: it removed ceilings, walls, ductwork, electrical work and light fixtures, wood construction, etc. It removed plumbing fixtures and capped drains. Everything was either recycled, with any proceeds going to Maxi Drug or Connor, or hauled away in dumpsters. The plan was to erect a non-bearing demising wall to separate the space into two spaces, completely rewire the building, remove the HVAC system and replace it with a separate system in one of the two separate spaces (which would entail cutting holes in the roof), leaving unresolved any plans for an HVAC system in the unused second space. The plan also was to replace the sprinkler system, cut into the floor slab in connection with planned construction, replace all ductwork, install new walls and insulation, and generally refit the space for use as two separate store spaces. Many of the components of the building were functional and operating and in compliance with Code requirements applicable to them, including an electrical service panel with a resale market value. Under its contract with Maxi Drug, Connor's responsibility was to remove and discard (or recycle or resell for Maxi's benefit) all building components removed, and replace them with new systems in compliance with current Code requirements.

On November 18, 2003, GUMB, GU, and C & S filed a Motion to Dismiss the suit against them. They argued that because of the assignment to Maxi Drug, Maxi Drug was the pertinent party, and DBD had failed to state a claim against them.

The court hearing on Plaintiff's request for a preliminary injunction began on November 19, 2002. The Defendants' Motion to Dismiss was denied. The court delivered findings and conclusions on the record on November 22, 2003 enjoining the renovation work, and requested the attorneys to confer on the language of the Preliminary Injunction. Under the court's preliminary ruling, Defendants were required to give DBD specific plans for the proposed renovation and construction work they intended to do on the property. As a result of that process, DBD became informed about the nature of the physical changes Maxi Drug intended to make to the building, and clarified that its objection was to the construction of the demising wall and the attendant changes to the use of the space and character of the shopping center. As a consequence, the hearing on the request for a preliminary injunction continued on December 6, 2003 to focus on that issue, and on December 18, 2002, the court issued a Notice of Decision granting a preliminary injunction halting the renovation work. The final merits hearing was placed on an expedited schedule, and a discovery schedule established. The final hearing took place on February 4 and 5, 2003.

Maxi Drug intends to divide the store in two, refit one half for its own use, and sublet the remainder. It expects gross sales of $6.5 million from its store, based on projections derived from its two existing stores in Barre. It plans to operate one of its prototype pharmacies. It has been negotiating with potential subtenants for the other half, particularly with a shoe store. It would sublet the space at a rental starting at $8.50 and increasing over time to $10.50 per square foot, roughly comparable to the rentals in the minor stores. It intends to add the gross sales from

9

its subtenant to its own sales in calculating whether percentage rent will be payable. It does not know the projected gross sales of its prospective subtenant. It projects 700-800 daily visits on its own business premises, but has provided no credible evidence of that, nor of the number of daily visits to a supermarket in the Barre area, nor of the projected visit count of its prospective subtenant. Its position is that as assignee of the lease, it is permitted under the lease terms to engage in any lawful use and to undertake improvements to benefit its business. It also argues that its business will be the functional equivalent of an anchor tenant.

DBD seeks to prevent Maxi Drug from dividing the store. While it now acknowledges that the lease is assignable, it claims that the splitting of the supermarket space will destroy the basic physical and financial structure of the shopping plaza as a community shopping center and turn it into a strip mall. It claims that Brooks Pharmacy is a specialty store and not an anchor store, and that Maxi Drug's plan means there will be no anchor store drawing foot traffic for the benefit of the minor tenants and in furtherance of the overall scheme of the plaza. It seeks a permanent injunction and other forms of relief discussed below.

The supermarket space is presently gutted. The cost to refit it for use as a supermarket is $72 per square foot, including all improvements for fitup except cash registers and shelving.

GU Markets of Berlin LLC is one of the corporate entities owned by GU and organized by C & S, and is now operating a Grand Union store in nearby Berlin, Vermont. Its corporate status was not allowed to lapse due to failure to file corporate reports. Employees of C & S are the officers of all of the entities owned by and related to C & S, and are in a position to make corporate business decisions that benefit C & S.


**Plaintiff's Claims**

I. Declaratory Relief

The facts show a clear dispute between the parties in the interpretation of the lease in which all parties have an interest.[8]  As a consequence of their disagreement, the property under lease has been gutted while the parties are at a stalemate. Both DBD and Maxi Drug have made considerable investments in furtherance of their positions. The property cannot be productively used until the issue of the parties' respective legal rights in the lease is resolved. A judicial declaration would not be merely advisory, but will settle a justiciable controversy. See Anderson v. State, 168 Vt. 641, 644 (1998). Therefore, the court declares the interests of the parties in the lease as set forth herein.

"Where the language of the agreement is clear, the intention and understanding of the

---

[8]In order to simplify the use of language and reflect the practical effect of relations among those involved, the word 'party' in this decision also refers to the Intervenor Maxi Drug.

10

parties must be taken to be that which their agreement declares." Lamoille Grain Co. v. St. Johnsbury and Lamoille County R.R., 135 Vt. 5, 8 (1976). No party is claiming that the lease terms are ambiguous, and the court does not find ambiguity. "To determine the meaning of a contract, we consider all parts so they 'form a harmonious whole,' but do not read terms into the contract unless they arise by necessary implication." Morrisseau v. Fayette, 164 Vt. 358, 366-67 (1995) (quoting Hill v. City of Burlington, 157 Vt. 241, 247 (1991)). The case calls for the court to construe terms of the lease in two categories: issues arising from assignment, and the scope of permitted change of use of the space.

*Issues arising from the assignment of the lease.*

The lease does not prohibit assignment, and in fact specifically envisions assignment by the original Tenant Grand Union. GUMB lawfully succeeded to the interests of the Tenant Grand Union as a result of the bankruptcy court Order. GUMB thus became the lawful Tenant under the lease, and had the right to make an assignment of the lease pursuant to paragraph 4. GUMB's assignment of the lease to Maxi Drug was permitted under the lease, and DBD did not have a basis for claiming that the lease could not be assigned. The assignment conferred upon Maxi Drug full liability to DBD for each and every obligation under the lease.

At the same time, GUMB retains full primary liability for each and every obligation under the lease until such time as it gives notice to DBD that it is terminating its obligations and/or liability thereunder. If and when it does so, such notice triggers DBD's right to terminate the lease. GUMB cannot purport to divest itself of its direct and primary obligation to DBD without giving DBD the right to terminate the lease. As such, it has full joint and several liability to DBD on every obligation. It is not "secondarily" liable, nor is it in the position of a guarantor.

DBD argues that GUMB has reduced its obligations, thus triggering DBD's right to terminate. While GUMB has attempted several times to persuade DBD to treat Maxi Drug as the tenant and to treat GUMB as only "secondarily" liable, GUMB has not actually engaged in specific conduct that reduces its liabilities to DBD, nor given notice that it has terminated its obligations. On the contrary, its written notices confirm its obligations and liabilities. The indemnification agreement between GUMB and Maxi Drug allocates risk and responsibility between those two parties, but does not affect GUMB's outstanding contractual obligations to DBD, which remain those of a primary obligor.

Thus, DBD may look to both parties for compliance with lease terms. It is not required to look to Maxi Drug first, and only to GUMB in the event Maxi Drug does not pay. DBD is entitled to communicate directly with GUMB to the same extent it communicates with Maxi Drug, and GUMB has no right to prevent such communications.

The corollary is also the case: DBD cannot prevent performance of lease obligations by Maxi Drug, or treat payment of rent by Maxi Drug as a breach of the lease by GUMB or as an

attempt by GUMB to reduce its obligations.  Thus, if either one of them pays rent, DBD cannot refuse it, but must accept it as rent paid by one of the obligors under the lease.  If either is in breach of the lease, DBD may seek relief from both on the same basis.  In sum, GUMB and Maxi Drug have coequal obligations to DBD.

DBD has not shown that either C & S or GU has any direct obligation to DBD under the lease.  Whether either has indirect obligations by virtue of its interrelationship with GUMB has not been the subject matter of the claim for declaratory relief.

*Issues concerning the scope of permitted change of use of the leased space.*

The fundamental issue in this case at the time of the final hearing was whether GUMB/Maxi Drug are entitled under the terms of the lease to demise the store space into two separate spaces, and occupy one while subletting the other.  This is the issue on which the parties have irreconcilable interpretations of the contract.  No party claims the contract is ambiguous.  Rather, each applies different principles of construction in interpreting its terms.  DBD emphasizes the primacy of the intention of the parties and implied use covenants in lease agreements.  Maxi Drug emphasizes the language of the lease that authorizes assignment "for the purpose herein permitted, or for any other lawful use. . ." as well as the principle that the drafters could have been more explicit if they intended to restrict the property to supermarket or single space use.

With respect to Maxi Drug's argument based on paragraph 4, it is worth focusing on the text of paragraph 4:

> The Tenant [Grand Union/GUMB] may assign this lease or sublet the demised premises, or any part thereof, for the purpose herein permitted, *or for any other lawful use* which will not be extra hazardous on account of fire *without relieving the Tenant, however, from its obligations hereunder. . . .* [I]n the event of an assignment or subletting during a renewal term, the Tenant herein may, by notice to the Landlord, terminate any and all obligation and/or liability of the Tenant named herein accruing after the expiration of such renewal term*. It is agreed, however, that the Landlord shall have the right to cancel and terminate this lease without further liability of either party to the other at such time as the Tenant's liability hereunder shall cease pursuant to the foregoing.* (Emphasis added.)

The basic structure, as evidenced by the stated terms, is that GUMB may assign the lease to Maxi Drug but remains fully obligated under the *original* lease terms–the use described on Page 1 of the lease–until at least the end of the current renewal period.  At that point, if GUMB wants to relieve itself of the obligation, it may–and its assignee may–be able to pursue "any other lawful use," but only with the approval of DBD, which has the option of terminating the lease.  Thus, by the specific terms of the lease, an assignment may not be made simply "for any other lawful use," but only for purposes of original use.  This limitation remains in effect for as long as GUMB retains its liability and obligation under the lease, which is also the period for which

12

GUMB may continue to exercise renewal options. Therefore, the pertinent inquiry is what is the scope of permitted change of use for Grand Union Stores of Vermont under the original lease terms.

The opening paragraphs on Page 1 of the lease refer specifically to the "shopping center to be constructed" and to "the annexed drawing" and provide that the premises and appurtenances are:

> . . . to be used for the sale of goods and any other lawful use including without limitation, a use as supermarket for the preparation, storage, display and sale of groceries, meats, fish, delicatessen products, fruits, vegetables, bakery and dairy products, candy, tobacco products and beverages, and for the sale of such other goods and the rendition of such services as the Tenant may from time to time elect, upon the following terms, covenants and conditions, and each of the parties hereto hereby agrees to perform and observe the covenants and conditions herein contained on its part to be performed and observed.

Additional covenants and obligations relating to use are contained in the following 24 pages, as well as in the several modification agreements signed over the ensuing 29 years.

Vermont law recognizes that lease terms may be implied where necessary to effectuate the purpose underlying the stated terms of a lease. "When [a] lease is silent on the subject a lessee has the right to put the premises to such use as he pleases, not materially different from that in which they are usually employed, to which they are adapted, and for which they were construed. But every such lease contains an implied covenant that the lessee will not use the premises for a purpose that would do violence to the limitations stated." Hinsman v. Marble Sav. Bank, 100 Vt. 48, 50 (1926) (citations omitted) (Hinsman I). See also Hinsman v. Marble Sav. Bank, 102 Vt. 217, 220 (1929) (Hinsman II). In these cases, the Vermont Supreme Court determined that because the use of leased premises as a fruit and vegetable store was materially different than use as a bank, which was the purpose of the original lease, the tenant's sublet for use as a fruit and vegetable store violated the implied covenant to put the premises to a use not materially different from that in which they were usually employed, to which they were adapted, and for which they were constructed.

Shopping center lease disputes often call for application of this doctrine of necessary implication in order to carry out the parties' clear intentions with respect to fundamental terms of a bargain. "Implied terms in a contract carry as much force as express terms. The implied terms either must arise from the language of the contract, or must be 'indispensable to effectuate the parties' intention.'" Commercial Leasing: Implied Covenants of Operation in Shopping Center Leases, 95 Dick. L. Rev. 383, 402 (1991).

Thus, the court is called upon to interpret the lease in a manner that reconciles, on the one hand, the language on Page 1 of the lease referring to "any other lawful use including without limitation" and "for the sale of such other goods and the rendition of such services as the Tenant

13

may from time to time elect," with, on the other hand, the identity of the tenant as an operator of supermarkets, the particular identification of supermarket use and the details of such use (groceries, meats, fish, etc.), specific reference to shopping center floor plans that show a single large Grand Union supermarket combined in a shopping center with "minor stores," and a variety of other lease provisions that set out the structure and organization of the shopping center as the basis of the parties' lease agreement.

The court concludes that the lease provisions as a whole, including all terms that arise by reasonable and necessary implication from the express terms of the lease, call for the leased space to be operated as a single unified space by a tenant that operates either a supermarket or a store with comparable characteristics: a store that sells a wide variety of products and generates daily foot traffic comparable to that of a supermarket. Maxi Drug's plan to demise the space cannot comply with this obligation.

The factors that lead to this conclusion include the following:

- There is reference throughout the lease and annexed plans to the Grand Union, supermarket use, and specifically identified grocery and food items to be sold. No other tenant in the plaza may be permitted by DBD to sell food for consumption off premises. If DBD was not able to provide a supermarket space by February 1, 1974, Grand Union could terminate the lease and DBD could not permit the space to be used as a supermarket for three years, clearly indicating the intended use of the property under the lease. The language of "any other lawful use" does not negate the importance of these references, as it is reasonable that the parties intended some flexibility in the evolution of Grand Union's business over a period of up to 40 years, while fundamentally relying on an implied understanding that Grand Union would continue in the supermarket business. In addition, the course of dealing shows that the parties did not think "any other lawful use" included a pharmacy, because when Grand Union wanted to incorporate one in its store, DBD objected in order to preserve the distinction between the supermarket and specialty minor stores, and its position prevailed between the parties.

- The lease incorporates specific annexed architectural floor plans, which are for a unified space supermarket. Furthermore, the lease provided for the expansion of the unified space, but not for its subdivision.

- The community shopping center structure is clearly reflected in the lease and all its modifications and annexed floor plans, under which the relationship between a large anchor store and complementary, non-competing minor stores was maintained over 29 years. The parties maintained fidelity to the physical layout as well as to the allocation of store uses between the large anchor store and the minor stores. This structure was further reflected in the concrete reality of the rent structure of all leases and the balance that was maintained over time between the large committed supermarket with a relatively low stable rent, and the smaller specialty retail stores, called the minor stores in the parties' own language, which had shorter leases at higher current market rentals. Maxi Drug's

14

plan would subvert this structure and convert the whole plaza into a strip mall, which is contrary to the overall structure reflected in lease terms.

- The addition of a "bubble" entrance to the Grand Union store was a physical, structural change significant enough to require a written modification to the lease. By comparison, splitting the store into two smaller spaces is a much more fundamental change in the building's physical structure, its economic structure, and in its public presentation. The course of dealing shows that this type of change required a written modification, reflecting the intent of the parties that such a change was not consistent with the necessary implied terms of the lease.

- Conversion of the plaza to a strip mall would allow Maxi Drug to obtain the benefit of rental at $3.30 a square foot while its competitor specialty stores pay $10 per square foot. It also interferes with DBD's interest, inherent in the structure of the shopping center, to ride up the market on the rental of the minor stores to specialty tenants, deriving indirect benefit from the existence of the anchor store. Such a conversion would also place Maxi Drug into direct competition with DBD, since both would be looking for the same specialty store tenants to occupy space in the plaza: Maxi Drug for its sublet, and DBD for its minor stores.

- Maxi Drug and its sublessee will sell the same category of product as the retailers in the minor store spaces, thereby destroying the symbiotic complementary relationship between the functions of the two parts of the plaza. The fact that 67% of Maxi Drug's sales at Brooks Pharmacies comes from pharmacy sales shows that a Brooks Pharmacy is a pharmacy, a specialty store that belongs in the category of the retail specialty stores, and not in space designed for a supermarket or other anchor tenant selling a wide variety of products.

- Maxi Drug has not shown that its plan for two stores in the former Grand Union space is the "functional equivalent" of an anchor store, as it has not shown that the number and type of visits that a Brooks Pharmacy and sublet tenant would attract are similar in number and type to those generated by a supermarket or other type of anchor store selling a wide variety of products.

Maxi Drug correctly notes that under paragraph 52 of the lease, neither it nor GUMB has an obligation to operate a business continuously. Maxi Drug argues that this demonstrates that it has flexibility in the type of business that it can operate in the leased space. This provision does not, however, contain an express agreement that Grand Union Stores of Vermont could simply have closed down and paid rent on a vacant large space for 30 or 40 years, or even use the space as a warehouse during that term. The lease terms contained an implied covenant to maintain a

15

business consistent with the terms of the lease,[9] but with recognition that over an extended period of time, there reasonably may be temporary times of non-operation, such as while the shopping center was originally being built, or if renovations are undertaken, or during periods of transition between the tenant and an assignee. Paragraph 52 cannot be used as a bootstrap to confer upon the tenant in possession the right to convert the entire shopping plaza from a community shopping center to a strip mall. The reasonable implication of this paragraph would have allowed Grand Union Stores of Vermont to suspend operation for temporary periods in a manner consistent with its lengthy lease, but does not support the proposition that it could divide the store in two and sublet to two specialty shops in competition with DBD's right to benefit from leasing the minor store spaces to retail businesses.

Maxi Drug also correctly notes that under paragraph 16, the tenant has considerable flexibility to "make such changes, alterations, additions and improvements as will, in the judgment of the Tenant, better adapt the same for the purpose of its business." This paragraph does not confer upon the tenant the right to unilaterally change the physical layout of the space "for a purpose that would do violence to the limitations stated"[10] in the lease–limitations that define the purpose of the lease within the business structure of the shopping center.

In Hinsman I and Hinsman II, the plaintiff landlord constructed a building with part of the space specially designed and built for bank purposes. The plaintiff leased that space to a bank for its use for 20 years, without specifically restricting the use of the space for banking purposes only. After 16 years, the bank moved out and sublet the space for use as a fruit and vegetable store. The Court did not adopt the plaintiff's position that the lease included an implied covenant that the premises could be used for banking purposes only, but the Court did determine that there was an implied covenant that the property would not be used "for a purpose *materially different* from that for which they had been usually employed, and for which they had been constructed and were adapted, and the sub-letting to Segale for such purpose and use [fruit and vegetable store] was a breach of the defendant's implied contract that it would not put the premises to a use materially different from that in which they were usually employed, to which they were adapted, and for which they were constructed." Hinsman II at 220 (emphasis added). The same analysis applies here. While the court will not imply a covenant requiring the subject premises to be used as a supermarket only, there is an implied covenant to use it as a unified space for purposes of a large store that sells a wide variety of products and generates foot traffic in a manner that benefits the minor retail stores as part of a community shopping center.

In sum, taking into account the specifically stated terms of the lease and the necessary implied covenants that are based on those stated terms, the court concludes that DBD is entitled

---

[9]See Commercial Leasing: Implied Covenants of Operation in Shopping Center Leases, 95 Dick. L. Rev. 383, 405 (1991).

[10]Hinsman v. Marble Sav. Bank, 100 Vt. 48, 50 (1926). See also Hinsman v. Marble Sav. Bank, 102 Vt. 217 (1929) (Hinsman II).

under the lease to prohibit a tenant from demising the former Grand Union space into two spaces and from using the space for purposes other than as a supermarket or other type of anchor store with reasonably comparable characteristics.

## II. Injunction

An injunction "may issue only in cases presenting some acknowledged and well-defined ground of equity jurisdiction, as when it is necessary to prevent irreparable injury or a multiplicity of suits." Vermont Div. of State Bldgs. v. Castleton Bd. of Adjustment, 138 Vt. 250, 256 (1980). "An injunction is an extraordinary remedy, the right to which must be clear. . . . Even where the right to an injunction is otherwise clear, it may be more appropriate to award damages than to issue a mandatory injunction. To determine whether an injunction is appropriate, the court must weigh the relative hardships on the parties, looking at 'the relative convenience or inconvenience, the relative injury sought to be cured as compared with the hardship of injunctive relief.'" Okemo Mt., Inc. v. Town of Ludlow, 171 Vt. 201, 212 (2000) (citations omitted) (quoting Fenwick v. City of Burlington, 167 Vt. 425, 431 (1997) (quoting Thompson v. Smith, 119 Vt. 488, 509, (1957)). "The potential loss of a business satisfies the irreparable harm requirement for the issuance of an injunction, and demonstrates the inadequacy of a remedy at law." Campbell Inns v. Banholzer, Turnure & Co., 148 Vt. 1, 7 (1987).

DBD has shown grounds for an injunction against both GUMB and Maxi Drug. Without an injunction, it is clear that they would proceed with Maxi Drug's $565,000 plan to change the property in a manner that would fundamentally alter the shopping center property and business. It would place DBD and Maxi Drug in competition with each other over the remaining 5-20 years of the lease and cause irreparable harm to DBD's ability over that term to obtain the benefits from the Grand Union lease and the shopping center as a whole that are implicit in the lease terms. Calculation of damages is not possible, as it would require projecting future income streams that would be compromised, but in an unknown amount.

Consideration of injunctive relief calls for the court to weigh the relative hardship to the parties. GUMB and Maxi Drug have alternatives: they can assign the lease to an anchor store tenant, or decide not to renew it, or negotiate with DBD to obtain a modification of lease terms. DBD, by contrast, would suffer irreparable harm and have no alternatives: it would lose the benefits of its lease over a period of 5-20 years, without being able to regain them, and would have a shopping center with a fundamentally different character than it planned and contracted to own and operate. For the foregoing reasons, GUMB and Maxi Drug are enjoined from demising the property, from cutting into, removing, or replacing structural systems without prior written agreement from DBD, and from operating one or two specialty retail shops in the former Grand Union space. Plaintiff's attorney shall prepare an Injunction Decree.

## III. Anticipatory Repudiation

"To constitute a repudiation, the defendant's statements must indicate a 'positive and unequivocal refusal to perform' under the contract." Lowe v. Beatty, 145 Vt. 215, 218 (1984) (quoting Carvage v. Stowell, 115 Vt. 187, 192 (1947)). "A repudiation before the time for

performance constitutes an anticipatory breach of the agreement." Lowe, 145 Vt. at 218.

The evidence shows that the Defendants and Intervenor acted on the basis of an interpretation of the lease that was not wholly without basis, even though it relied on language in the lease that it read in isolation, rather than in conjunction with other lease terms as a part of a harmonious whole. Their actions were taken in reliance on an interpretation of the lease, and not on the basis of a refusal to honor it. DBD has not proven an anticipatory repudiation of the lease.

IV. Ejectment

Paragraph 55 of the Lease states, "Breach of any covenant of this lease, except a covenant to pay rent, shall not entitle the Landlord to a forfeiture of the term hereof." The covenant to pay rent has not been breached.

DBD based its ejectment cause of action on its claim that GUMB reduced its obligations and liabilities under the lease, entitling DBD to terminate the lease under paragraph 4. The court has determined, based on the findings and conclusions above, that GUMB has not reduced its obligations. Therefore DBD does not have a basis for terminating the lease, and consequently has not shown grounds for ejectment.

V. Damages

While there has been considerable removal of the building fitup for supermarket use and some alteration of structural components, DBD has raised no objection to the quality of any renovation work being pursued by GUMB and Maxi Drug. Rather, the objection is to the design and character of the proposed resulting building. Rent is current, and GUMB and Maxi Drug continue to hold the right to use of the premises consistent with the terms of the lease as declared in this action. Thus, they retain the opportunity to restore the premises to a condition in which DBD is not damaged. Plaintiff's claim for damages is premature.

VI. Breach of Duty of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing means that each party to a contract promises "that each will not do anything 'to undermine or destroy the other's rights to receive the benefits of the agreement." Southface Owners Condo. Ass'n v. Southface Condo. Ass'n, 169 Vt. 243, 246 (1999)(quoting Carmichael v. Adirondack Bottled Gas Corp. of Vermont, 161 Vt. 200, 208 (1993)). The purpose of the covenant "is to ensure that parties act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" Southface Owners, 169 at 246 (quoting Carmichael, 161 Vt. at 208).

In analyzing whether the conduct of GUMB and Maxi Drug violated the covenant of good faith and fair dealing, it is useful to compare that conduct with the conduct of the parties to the lease during the previous 29 years, during which time the parties to the lease acted with faithfulness to the agreed common purpose. During that period, when either DBD or Grand

18

Union wanted to do something not clearly within the permitted terms of the lease, they negotiated a modification agreement, or they did not do it: rental of a minor store space to a non-retail tenant called for a written modification; relocation of the store entrance did not take place without a written modification; a matter as detailed as consent for a restaurant in a minor store to sell beer for consumption *on* the premises called for a modification agreement; Grand Union backed down from its plan to incorporate a pharmacy in its store when DBD pointed out that it would compete with Brown's Pharmacy; and the construction of a bubble front called for a written modification agreement.

GUMB and Maxi Drug went ahead with a $565,000 plan to gut the building, including cutting into and replacing structural components for which DBD was responsible, knowing that DBD objected to such changes, and throwing the burden onto DBD to take legal action to stop them, thereby shifting to DBD the obligation to undertake significant expense. They did so without disclosing to DBD their specific renovation and construction plans prior to undertaking work that affected structural components of the building. In fact, Maxi Drug's contractor applied for the building permit in the name of DBD, and obtained a permit issued to DBD, without ever informing DBD of the plans for alteration. The proposed alterations to the structural components of the building required a written modification of the lease.

They also went ahead, knowing that DBD objected, with a plan that would fundamentally change the character of the building and put Maxi Drug in direct competition with DBD as lessor of retail shops in the plaza, thus reducing the benefits of a community shopping center structure to DBD over the ensuing 5-20 years. In doing so, they deliberately withheld information from DBD, such as whether the lease was being assigned and what the specific renovation plans were. They were certainly in possession of that information, as Maxi Drug had a half-million dollar contract with Connor Construction. GUMB stated repeatedly in writing that it was not reducing its obligations under the lease, and it is therefore charged with the same knowledge. Proceeding with such conduct violated the obligation to ensure that DBD received the benefits of its lease agreement, and was clearly totally inconsistent with the conduct of the parties to the lease during its 29 year history of implementation. The proposed changes to the fundamental character of the leased space and the shopping center as a whole required a written modification of the lease.

The situation is complicated, of course, by the fact that the parties had different interpretations of what was permissible under the lease, and they asserted their respective positions vigorously. Furthermore, DBD was taking a position that the lease could not be assigned at all, as well as a position that it was not required to accept rent from Maxi Drug and that for GUMB to not make the rental payments amounted to a reduction by GUMB of its obligations, triggering DBD's right to terminate the lease. Neither of these positions is supportable. Nonetheless, proceeding to gut the building, including making changes to structural components, without even providing basic information about the instructions given to the contractor, and making a fundamental change in the character of the shopping center, cannot be viewed as consistent with the Tenant's obligation of good faith and fair dealing under the lease as it was written and had been implemented over 29 years.

19

Damages resulting from this breach do not include damage to the building. As stated above, it is premature to determine that GUMB and Maxi Drug have damaged the property in a physical sense. While there has been some work done to structural components, DBD does not object to the quality of such work, and there is no evidence to suggest that the quality or physical integrity of the building has been compromised.

Rather, damages include the costs imposed on DBD of having to undertake legal action to halt the project while the respective rights and obligations of the parties could be sorted out in a manner consistent with lease terms. Because litigation costs would have been inevitable, as a declaratory action was needed in the absence of a modification agreement, the damages flowing from the breach of the covenant of good faith and fair dealing are limited to the portion of the costs related to the need to seek a preliminary injunction to prevent GUMB and Maxi Drug from irreparably changing the building before the declaratory action could be heard. The court awards Plaintiff damages of $1,000.00 for such costs against both GUMB and Maxi Drug. While actual costs no doubt exceeded this amount, the bulk of the costs of the litigation would have been incurred in any event without a breach of the covenant of good faith and fair dealing.

VII. Punitive Damages

"Punitive damages are generally not recoverable in actions for breach of contract. However, in certain extraordinary cases in which the breach has the character of a wilful and wanton or fraudulent tort, punitive damages may be allowed. Punitive damages are awarded not as compensation to the sufferer, but 'on account of the bad spirit and wrong intention' of the breachor." Murphy v. Stowe Club Highlands, 171 Vt. 144, 154-55 (2000)(quoting Clarendon Mobile Home Sales, Inc. v. Fitzgerald, 135 Vt. 594, 596 (1977)). Malice may be inferred and is shown by "conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights." Murphy, 171 Vt. at 155 (quoting Ainsworth v. Franklin County Cheese Corp., 156 Vt. 325, 331-332 (1991).

Here, the action hinges on compliance with terms of a lease, which is a contract, and the threshold for punitive damages is high. The conduct of GUMB and Maxi Drug reflect tough business tactics, but not the degree of malice required for recovery of punitive damages in a contract action. The recovery for breach of the covenant of good faith and fair dealing addresses the nature of the violation for which recovery is available.

**Defendants' Affirmative Defenses**

Several of Defendants' affirmative defenses relate to Defendants' position that the lease is assignable. Since the Plaintiff now concedes that it is, and the court has so determined, these defenses are moot. As to the affirmative defenses of unclean hands and waiver, Defendants have not proven the elements of these defenses.

20

Defendants C & S and GU correctly note that with respect to the contract claims, DBD is not in privity with them. Accordingly, all causes of action based on breach of contract and related covenants are dismissed with respect to Defendants C & S and GU. With respect to the claim for injunctive relief, because the directors and employees of GUMB are the same as those of GU and all are also employees of C & S, and because of the secretive manner in which C & S and GU conducted themselves with respect to DBD, Plaintiff has proved the need for equitable injunctive relief prohibiting action by all Defendants as entities with an interlocking relationship with the corporate Defendant GUMB.

**Defendants' Counterclaims**

Defendants C & S, GU, and GUMB did not sustain their burden of proof with respect to the counterclaims. Therefore, their claims for injunctive and compensatory relief are denied. Their claim for declaratory relief has been resolved in conjunction with Plaintiff's parallel request.

## Order

Plaintiff's attorney shall prepare an Injunction Decree and Judgment Order, based on these Findings and Conclusions.

Dated at Montpelier, Vermont this ____ day of March, 2003.


Mary Miles Teachout
Superior Judge

21